24-1466 Canatex Completion Solutions, Inc. v. Wellmatics, LLC Go ahead. We don't, I think, I'm going to use the word technically, have a correction question. We have a claim construction question. That is, there is no request to change the words of the document that sits in from the patent office as the official document. That's what 255 allows the patent office to do. We have a question of whether when a skilled artisan reads the language in this claim and the specification, after a moment's thought, the skilled artisan would understand that the wrong words were chosen and these words have to have meant and must mean the thing that you say. Namely, that the word second there really ought to be first. So I'm not sure why exactly the same standard would necessarily apply under 255 to what the patent office can do to this. So on this question, do I understand correctly that the heart, maybe just up or down, of your claim is there is no reasonable alternative to the understanding that you say any skilled artisan would have. And it requires, first of all, seeing that two or three identical mistakes were made in the spec, one of them being painfully clear on its face that it was a mistake, which then tells you that all the other ones were also a mistake. And same thing with the claim. Yes, Your Honor, that is our position. And if you look at the drawings and you see the first part and the second part, it becomes painfully obvious where the mistake is. The first part is the piece that attaches to the downhole tool that may get stuck. And the second part latches that first part. And so if you look at the second, the specification and the claim with respect to the second part, it talks about a releasable engagement profile engaging the first part and latching the first part and releasing that first part. And so when you look at how the claim is structured, everything refers to the first part except for that last reference to the first part. It turns out to be the second part. But if you read through that claim, it's clear that what we're talking about is the engagement profile of the first part. And just to return to maybe where we started, if I thought what you just said is right, that there is simply no reasonable alternative, what role, if any, should be played by the extraordinarily high degree of sloppiness that is evident here? Your Honor, I've struggled with trying to understand. And I would concede that it is extraordinarily sloppy. I've struggled to understand what happened. I think that at some point prosecution counsel wanted to change the order of first and second part because they talk about the first part as being downhole and the second part as being uphole. If I prosecuted this case, I would have talked about it as downhole and uphole so we don't confuse each other. But at some point I believe that they chose to change the order and talk about the uphole section as being second part and the downhole part as being the first part. But ultimately you acknowledge the sloppiness but are saying that just shouldn't play a role if you meet the very demanding standard that there is no other reasonable reading of this claim language. Read against what the claim language says about what is releasing what. The outside piece is releasing the inside piece that's going to come out and it's doing it by expanding so that it can come out and the fact that it's also evident from the spec. You're ultimately saying really so sorry about the sloppiness but that shouldn't make a difference. In your honor, I agree with you. That's where we are. But I think we also need to take into consideration the fact that at the preliminary injunction hearing no one, not the appellee, certainly not the appellate, raised the issue of this mistake in the claim. All the parties understood what the claim was supposed to claim and in fact we believe that makes the error evident. Can I just ask you just on a little different? I mean what's bothering me about this case is the public notice function that the patent is supposed to serve and you've got a lot of people out there who are trying to do due diligence in reading a patent and making a lot of investments on the outside based on what the patent says. That's a hard job given our claim construction disputes that arise with respect to every patent that's ever challenged. But isn't it particularly hard and challenging if now you're saying the public notice includes everyone out there doing a deep dive and not reading literally what clearly the patent says and noticing and taking notice and then correcting themselves. Well, we know the patent owner couldn't have meant this so it means something else. Doesn't that bump up against the public notice function that we're supposed to be in? It does, Your Honor. And when you look at the drawing and the purpose of the tool then there can be no other reason than that reference to the second part must be in the first part. Similar to the Ultimax case where there was a comma missing. A person of ordinary skill in the arts would understand that a comma was missing and insert that comma. And, in fact, we believe that a person of ordinary skill in the arts would understand that the reference in the claim to the second part is indeed a reference to the first part. During your rebuttal time, would you like to state some? Yes, Your Honor, I would. Thank you, Your Honor. May it please the Court. Philip Lawrence on behalf of the athlete. Judge Prost, I'd like to go back to the very first question that you asked my friend about the standards and if they're different. And I believe that this Court has clearly articulated, and Judge Toronto hit on it as well, that the standards are absolutely different. In 254 and 255, as the statutory scheme is set up, the Patent Office has broader authority than the District Court to protect the patent. Because the Patent Office can look beyond an obvious claim and can correct and even broaden claims in a certificate of correction, as long as it is a minor typographical error in the patent. This Court in Nova laid out that the authority of the District Court to correct the claim is much smaller and narrower. It's actually a subset of those minor typographical errors that are obvious. Basically so obvious that the Patent Office wouldn't take the time to go to the Printing Office and issue a certificate of correction. Because everyone in the world, to your public notice point, knows exactly what the correction is. So, as Judge Toronto said, the standard is exacting and is extremely narrow because of the public notice function. Well, I don't see anywhere in Nova or anywhere else where it says you can only correct, like, commas or typos or grammar errors. It says the correction is not subject to reasonable debate based on consideration of the claim language and specification. That's the standard, correct? Yes, Your Honor, but... It's not limited to typos. No, I'm not saying that. I'm not arguing that at all. What I'm saying is that the error must be so obvious that there just is absolutely no... Judge Toronto, I think, said it the best, where you just read the claim and you know, without a shadow of a doubt, that there's a problem here and we know exactly how to fix it. So, let me just tell you, I truly do not see any reasonable alternative to this correction. So, persuade me otherwise. Yes, Your Honor. So, if you look at the patent itself, at the appendix APP 015, the problem with respect to the correction is that the discussion solely comes from the preferred embodiment. That's what Mr. Cabello was referring to in the three drawings and a bit of the discussion. His entire argument focuses solely on that preferred embodiment and the reading of that. But this patent, in numerous places, unlike many patents that just use a boilerplate to say, you know, oh, the claims aren't limiting, it goes out of its way to say that this embodiment is not limiting. And we put forth, in the district court, an expert's declaration who said, this tool could be constructed in other ways. Right. I read the expert declaration. I must say, I thought it all seemed without foundation. That was as nice as he could possibly say. Well, Your Honor, the issue is one of ordinary skill in the art can appreciate what a connection profile is and there's no doubt that the court did and identified both, which can be seen in the drawings. There's one at the top of both pieces of the tool. But that is not to say- Just reading the claim, there is the engagement thing, the connection profile of the downhole part that's just going to be left in the drilling hole until somebody comes and fishes it out. By expanding this, you release that. Now, that has to be this thing. It's not releasing something else from what's on here. Well, Your Honor, that presumes that that's the only embodiment and the only way- What I just said is entirely the claim. It's entirely the claim, but you have to read the claim in light of the specification. And you're presuming that that claim is directed to the one and only preferred embodiment. No, I'm not. I'm reading the claim language about radially expanding the engagement profile to release the thing that when it's not expanded, it's holding. The thing that it's releasing is this. That's the first part. Correct in that reading of the preferred embodiment. But, Your Honor, if you go to the specification at column 4, line 5, and this goes- We sort of jumped down into the error is obvious on the face and now the only way to correct it would be the second part. I disagree with that part of the test because if you were to look at column 4, line 62, it says once the piston has been shifted sufficiently, second part may be disengaged from first part by pulling, applying a sufficient force to second part to disengage releasable engagement profile from connection profile. And so that second part has a connection profile itself at the top. And that is where you apply that sufficient force. So that second part of the claim language, if it has an error in it, it may not necessarily be the first part. It could be, if we're going to what the patentee intended, it could be that they're trying to talk about this section about applying a sufficient force to cause that release. And that sufficient force would be applied to the connection profile of the second part, not the first part. So it could be that the claim language was intended to say something about the second part as supported by this piece of the specification. Also, with respect to that same, just a little further down in that section of the patent, it says while releasable engagement profile 26 may be resilient and resist outward movement, releasable engagement profile 26 may also be simple engagement members that are able to slide out of the way once piston 32 has been shifted. I have a question. Connection profile 16, isn't that the connection profile of the first part, 12? Throughout the entire specification, isn't connection profile 16 the connection profile of the first part? Yes, your honor, that's the connection profile of the first part in the drawings, which is in the preferred embodiment. No, throughout the whole spec. Connection profile 16, when they use that number, it's referring to particular drawings. That is the connection profile of the first part. But that discussion only appears in one place, talking about the preferred embodiment. The problem that we face is that... Actually, it appears, let's see, 1, 2, 3, 4, 5, 6, 7, 8, 9. The word connection profile 16, 10, 11, 12, 13, 14, 15. 15 times, to be clear.  Okay. It doesn't appear one time. Sure, your honor, but it's in the only preferred embodiment. As we know from the Thorner case, the Hillrun case, we don't limit patents to the preferred embodiment in the only way that is shown to be drawn. No, you're trying to draw some import from the bottom of column 4. And I'm saying you're failing to appreciate that to the extent column 4 talks about a connection profile, it actually says connection profile 16. And connection profile 16 is only the connection profile of the first part. So it can't have, no skilled artisan would read column 4 to understand the connection profile 16 as being the connection profile of the second part. I'm not saying that at all. What I'm saying is that in the part in column 4 is that there's a force applied to the second part, and that force is applied, one of ordinary skill in the art would understand, if we look back at the drawings, to the connection profile of the first part, which is tubing connector 22. That is where that force is applied. It is applied to a connection profile. And so what I'm saying is one of ordinary skill in the art. So in that model, right, you have the string that goes all the way up to the ground, and you come to this two-part thing that's now deep in the hole. And at the very, basically where it attaches to the string, there's this little connection profile, right, way up here. And then come down, this is the second part, to where it mates with the first part. And the release profile, the release engagement profile, sits at this end of the second part. By expanding, and now I'm talking about the claim language. By expanding this, you're going to release this from the connection profile up by the string. No, Your Honor, that's not what I'm saying with respect to what's being said in column four. What we're talking about now is if we get to the point where we say, okay, the error is obvious on the face, how do you correct it? What I'm saying is if you appreciate that it says the release, the portion about the second part, you could literally delete that entire clause as to if it, not just the wording is incorrect of the second part, but the whole phrase. Maybe that whole phrase wasn't intended to be there. And you could simply grab language from down here in this part of the spec and replace it as we did in our brief, our red brief at page 38. And this is a reasonable correction that changes the scope of the claim and has not been rebutted by the other side on the topic of reasonableness at all. So, for example, this is- But here's why. I mean, you're offering, the question is how would a skilled artisan read this? And to the extent that they repeat the error that's in the claim in the spec, they actually attach number 16 to it. And so a skilled artisan would look and they'd be like, well, no, they clearly, 16 is the connection profile of the first part. So they attach that number to the error. Well, Your Honor, I respectfully would disagree with every place that happens. In fact- No, in the abstract, you're right. It doesn't have the number 16, but we're talking about a skilled artisan reading this, and what would they think? Not just the abstract, Your Honor. In the summary, which I think is important, because as it goes through, it says, according to an aspect, according to another aspect, according to another aspect, and it lists this language in there. And then at the very end of it, it says, in other aspects, the features described above may be combined together in any reasonable combination, as will be recognized by those of skill in the art. And one of skill in the art, in our case- And you guys weren't even confused, right? In either in the PI, in the PI, or in your invalidity contentions. In both cases, you treated this term as applying to the connection profile of the first part. And if you're confused about where you did it, it's page 478 and 479 of your invalidity contentions. You all glossed right over this error and treated it as meaning exactly what he says a skilled artisan would understand it to mean. Well, Your Honor, first of all- So, what do we do with that? With respect to the preliminary injunction, that's obviously a different phase of the case that happens early on, where we don't have to come forward with our claim construction positions or disclosing. Actually, it was incumbent on the plaintiff when they're presenting to the court to identify the likelihood of success on the merits and identify all the issues that they would have to overcome and deal with in the case and prevail on them. At the point where they did not do that and put forward just plain and ordinary meaning, all we had to do was beat them on their playground and say, okay, if they're correct on everything, we can still succeed to beat your preliminary injunction by defeating your likelihood of success on the merits and other equitable issues that came up. It wasn't- Okay, fair. Get to the invalidity contentions. The invalidity contentions also happened early in the case where we- You treated it as meaning exactly what he says it's evident to a skilled artisan it would mean. We treated it as accepting in the best case scenario their argument. If we're going to apply 102 to it, we would apply that. But with respect to our plaintiff's- But you've been accepting their. It's your invalidity contentions. Right, but in your invalidity contentions, you often accept the argument of the other side as they're reading the claim to apply your prior art to it. And that's what we did with respect to the 102 issues. In our invalidity contentions, we also raised 112 and indefiniteness and identified this as a problem there. And so we can make alternative arguments without eliminating our ability to argue indefiniteness during the claim construction phase. And to assume that we didn't recognize it at the preliminary injunction phase is pure speculation on his part. He has no idea what we recognized or didn't recognize and what we were going to do strategically in the case. But nevertheless, to Judge Toronto's point, this patent is sloppily drafted, sloppily written, and we do face the issue of a public knowledge problem. So what case law or principle says on the assumption, which I know you resist, where you say, no, there isn't only one reasonable correction, or at least one reasonable small correction. But taken as an assumption, there is, and that any skilled artisan would recognize what this was meant to say. And it's a very small change, so it's very much like the very narrow absurdity doctrine in statutory construction law. If you look at Scalia-Garner, Chapter 37, it's exactly the same principle. But on that assumption, what tells us that the repetition of sloppiness should, I don't know, equitably disentitle the patent donor to the construction that every reasonable, every skilled artisan would understand to have been meant? Well, the hallmarks of a major error versus a minor error from the case law of this court indicates that even sometimes the error can be so obvious and you think you might know what it is, but it's just... But I'm asking you just versus this question, except that we all know what the correction is. What does the sloppiness, the degree of sloppiness, have to do with whether they then get the benefit of that or they've lost it because, my goodness, this was sloppy? Well, Your Honor, I think it falls back on the public notice issue. I think you would have to say even if it's sloppy, they might know it's sloppy and maybe a person of ordinary skill might come to that conclusion if they do a deep dive. But to Judge Prost's point, when you first read it, you have people diligencing and maybe they don't see it as they claim we didn't. Right, but that certainly means there has to be a very, very demanding standard. But at least since, what is the Supreme Court case, ITS rubber, which... Essex case, yes. Essex. Yes, Your Honor. That public notice is either modified a little bit or because of the very high standard, one concludes to the relevant public, there's no notice problem. The relevant public would understand. So assuming the standard is that high, what's the legitimate role of the fact that this mistake was made repeatedly? Well, according to the person of ordinary skill in the art, and I believe a reader of the patent could say, wasn't necessarily a mistake because it does appear like it could have been intended language. And so if it was intended, then you read the claim as it's drafted, just like in the Chef America case. Okay, just moving, just, I mean, the tension, and I agree with Judge Toronto and his observations earlier that the two proceedings in the judicial correction is different, markedly different, different than the PTO correction. But in this case, as it happens, when they went to the PTO after the district court, what would happen if they had prevailed before the patent office and they had gotten a correction? Because as we know, the ramifications of what's done is significant because when the PTO makes this correction, it only applies prospectively, whereas the district court's judicial correction applies retroactively. So what would we do hypothetically in an instance if the PTO had granted their correction? Where would that leave you? Would you still be bound by the judicial correction here? If, so, when you ask where would that leave us? In terms of when the effect, what is the effect of the? So the effect on the lawsuit would be the certificate of correction would be prospective, and the claim that happened before their lawsuit as it stood wouldn't have the benefit of that claim. That's what the case law, I think, Superior Fireplace says that. So they would have to. But wouldn't the judicial correction here, if we were to reverse it and say there should have been judicial correction, wouldn't that override that in terms of just the temporal question I'm asking? I believe in the temporal question, if you decide that judicial correction applies, and that's the difference between the two. One is prospective and one is retroactive for purposes of damages. I have a dumb question. But when you have a reissue, which is I think what we're talking about in terms of the PTO correction, it would be a reissue, wouldn't it? No, you're right. It's not a reissue. With reissue, you could actually turn in the old patent. Correct. That's why it's prospective and retrospective. Okay, thank you, counsel. Your Honor, a couple of points that I wanted to raise. First of all, on the second part, the tubing connector, 22. That's the one way up by the string? Yes, the one that's connected to the wire line. That one is never to be released. And I believe that if you look at the tutorials, both the appellant's and the appellee's tutorials, which are found in the joint appendix, and I'm happy to give the court a reference to that. Those tutorials are found in the appendix at 1226 and 1253. The appellant's at 1226 and the appellee's at 1253. The operation of the tube is consistent, and that is that the goal is to release the stuck tube down the hole and retrieve the wire line, and in this case, the second part. There's no dispute about how this tube operates among the appellee and the appellant, and certainly among a person of ordinary skill in the art. Importantly here, the tubing connector is never referred to as a connection profile. And in fact, if you look at the claim and you look at the Red Book, I believe that the appellee's introduced a certain amount of error at Red Book 12 by showing the profiles of 22 and 16. That is the connection profile and the tubing connector. They look similar because they both have an electrical connector. You'll notice that there's a slight difference in the physical configuration of the tubing connector and the connection profile. But what is clear in the tutorials and what is clear in the patent is that the second part is never released, and the tubing connector 22 is consistently referred to as a tubing connector and never referred to as a connection profile. And we believe that the court committed reversible error by finding that the tubing connector 22 was a connection profile. If you look at the second part of the tube found in figure one, it would be physically impossible, physically and mechanically impossible for the tubing connector to be released from the releasable engagement profile because it's on the same physical element. One quick question, I don't want to take your time. Is this patent previous? I know it's a pretty new patent. Has it previously been asserted in other litigation? No, Your Honor. Our client built this tube and opened up the market for what's called a ballistic. They call it the BRT ballistic releasable tube. They use an igniter to create a gas source to release the tube. And we contend that GRE Wilmatics developed their tube by copying ours, and therefore the operation is somewhat similar. Mechanically, there's a couple of differences, but there is a first part and a second part. The second part is retrieved with the wire line, and the first part is left out with the stuck tube. Just out of curiosity, is the prosecuting counsel paying your bills for this? I mean, why has your client got to pay for this? My client is sitting right back there, Your Honor, and I'm sure he's taking notes, and we'll approach the prosecution counsel about paying for this. It is a real problem, Your Honor. And the court asked why we didn't go back to the patent office. We think it's going to take a lot of time, but the court is certainly in on the issue. They don't seem very sympathetic to you. They don't. But it's also the issue of retroactive damages, recognizing that we would not be entitled to any retroactive damages if the PTO corrects it, and certainly entitled to it if this court corrects it. All right. Thank you, counsel. I thank both counsels. The case is taken under submission.